UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**ROBERT JOSEPH ETZEL**<br>**KELLY ROSE ETZEL**,<br><br>                Debtors. | Case No. **13-61353-11** |
| **KAREE VIEYRA**,<br><br>                Plaintiff.<br><br>-vs-<br><br>**KELLY ROSE ETZEL**,<br><br>                Defendant. | Adv No. **14-00001** |

## MEMORANDUM OF DECISION

At Butte in said District this 19th day of June, 2014.

Pending in this adversary proceeding is the Plaintiff Karee Vieyra's Motion for Summary Judgment (Document No. 14; hereinafter "Plaintiff's Motion") in which Plaintiff seeks exception from the Defendant/Debtor Kelly Rose Etzel's discharge, under 11 U.S.C. § 523(a)(6), of a debt arising from a Montana Human Rights Commission ("HRC") agency decision against Defendant for unlawful sex discrimination. Defendant filed a response in opposition on the ground that the agency decision is not a final judgment entitled to preclusive effect. After review of the Motion and response, Plaintiff's reply brief, and applicable law, for the reasons below the Plaintiff's Motion for Summary Judgment will be denied. Trial of this cause will commence on July 1,

1

2014.

This Court has jurisdiction of the above-captioned Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a). This adversary proceeding is related to the above-captioned Chapter 13 case under § 1334(b). The parties' pleadings agree that this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability of Plaintiff's particular debt under § 523(a)(6). This Memorandum of Decision includes the Court's findings of fact and conclusions of law under F.R.B.P. Rule 7052.

## FACTS & PROCEDURAL HISTORY

Plaintiff submitted a Statement of Uncontroverted Facts (Doc. 13) in support of her motion which sets forth the following:

1. Karee Vieyra began working at Bella Sauvage in March 2008 as an esthetician and nail technician. Vieyra 9 (Attached as Exhibit 1[1]). Kelly Etzel was the owner of Bella Sauvage. Vieyra 9; Etzel 393. Vieyra did manicures and pedicures, waxes, and facials for Bella Sauvage's customers. Vieyra 9-10. Vieyra got along well with her co-workers and supervisors. Vieyra 10-11; Littlefield 172. Vieyra had numerous repeat customers. Vieyra 10-11. She was a hard worker and often worked six days a week. Littlefield 174; Costello 196; Etzel 396.

2. In June 2011, Vieyra learned that she was pregnant with twins. Vieyra 15. She called Etzel and informed her of the pregnancy. Vieyra 15-16; Etzel 377. In the summer of 2011, Etzel hired Kaylene Nelson to be the manager of Bella Sauvage. Vieyra 14. Nelson answered to Etzel and met with Etzel almost every work day to discuss Bella Sauvage. Etzel 367-68. Etzel gave Nelson the authority to fire Bella Sauvage employees. Etzel 396.

3. In July 2011, Vieyra found that, because of the pregnancy, it was becoming extremely uncomfortable for her to bend over close to the ground. Vieyra 17; Henderson 344-45. This made it very difficult for Vieyra to perform pedicures, which required her to be in a hunched-over position close to the ground for extended periods of time. Vieyra 17; Littlefield 175. The body position required for doing pedicures is very different than the body position necessary for

---

[1] Plaintiff's Exhibits ("Ex.") 1, 2, 3, 4, 5, and 6 accompany Plaintiff's Motion at Doc. 13.

facials and waxings, and requires more bending. Vieyra 17, 20; Bowman 101.

4. Vieyra approached Nelson and told her that it was becoming difficult for her to do pedicures; Nelson responded, after conferring with Etzel, that Vieyra would need to get a doctor's note if she wanted to stop doing pedicures. Vieyra 21; Nelson 293.

5. Vieyra contacted her obstetrician, who signed a note on August 1, 2011, stating that Vieyra was not advised to bend over for long periods of time, as when performing pedicures. Vieyra 23; Hearing Exhibit 1. Although most women who are pregnant do not need such restrictions, Vieyra's case was different because she is a very small person and she was carrying twins. Henderson 344. The restrictions were necessary in Vieyra's case and were not just an excuse for her to avoid doing pedicures. Henderson 346. Vieyra gave the note to Nelson on or around August 15, 2011. Vieyra 24.

6. When Nelson gave Etzel the note, Etzel became enraged and complained about the restrictions. Nelson 296; Etzel 359. Etzel stated to Nelson that Vieyra was using her pregnancy as an excuse to avoid doing pedicures. Nelson 296. Although she had not seen Vieyra try to do a pedicure while pregnant, Etzel assumed Vieyra was just being manipulative and dishonest. Etzel 359. Etzel called Vieyra's nurse, Gina Henderson, and complained in a very angry tone, "this is bullshit!" Nelson 297; Henderson 348; Etzel 362. Etzel told Henderson that she did not believe the restriction were necessary. Henderson 348.

7. After speaking with Etzel, Nelson made several handwritten notes on the doctor's note, including the phrase, "list of things she can do!!" Nelson 295-96; Hearing Exhibit 1. Nelson then called the nurse back and asked if the obstetrician could provide a more detailed note. Nelson 299.

8. On August 18, 2011, Vieyra's obstetrician faxed Bella Sauvage a more detailed note which stated that Vieyra was not able to bend for longer than 30 minutes at a time without a one hour break of standing or sitting. She was not able to stand for more than one hour without a break of sitting for 30 minutes. She was able to sit in an upright position for an unlimited amount of time. Vieyra 28-29; Hearing Exhibit 2. During the "breaks" of standing or sitting, Vieyra was still permitted to work. Henderson 348. Under these restrictions, Vieyra was not supposed to perform pedicures, which involved bending for more than 30 minutes. She could, however, still do manicures, which requires sitting in an upright position. She could still do waxing, which involved standing up. If the wax took more than an hour, she could sit for part of it. If she was standing for an hour, however, she would need to ensure that she spent the next half hour in a sitting position. Vieyra could still perform facials, which could be done either

3

standing or sitting upright. Vieyra 28-31.

  9. Upon receiving the second note, Etzel directed Nelson to ensure that Vieyra was taking 30 minute breaks from work every hour. Etzel 364. Nelson informed Vieyra that Etzel had received the second doctor's note and told Vieyra that she was on Etzel's "shit list" because of the medical restrictions. Vieyra 31-32; Nelson 317. Nelson told Vieyra that she could not "have [her] cake and eat it too," and that she would have to follow the instructions to a T. Vieyra 34. A coworker observed that Nelson was visibly angry about the note and told Vieyra that she would call her every hour on the hour to make sure that Vieyra was "sitting on her butt." Costello 199, 211. Etzel and Nelson were not acting out of concern for Vieyra's health but were retaliating against Vieyra for obtaining a doctor's note. Costello 200.

  10. After the second note, Vieyra noticed that there was increased hostility and tension on Nelson's part. Vieyra 32. Other employees noticed the increased friction between Nelson and Vieyra after the doctor's note. Costello 218; Scheffer 233, 250. Respondent's witness Christine Scheffer observed that Nelson was "definitely annoyed" at Vieyra because of the doctor's restrictions. Scheffer 250. Vieyra felt uncomfortable and was worried that she would get in trouble no matter what she did. Vieyra 33. She told other employees she was worried she would be fired. Scheffer 244.

  11. In August 2011, Nelson realized that an old appointment book was missing. Etzel directed her to try to find the book. Nelson spoke with two employees who said they did not know what happened to the book but that Vieyra might have it. Nelson 305-06, 321-22.

  12. On August 31, 2011, Nelson confronted Vieyra and asked if she had taken the appointment book, and Vieyra said no. Vieyra 35-38; Nelson 307. Nelson replied that she did not believe Vieyra. Vieyra 37.  Nelson told Vieyra, untruthfully, that two reputable sources had informed her that Vieyra had taken the book. Nelson 307-08. Nelson kept insisting that Vieyra had taken the book and Vieyra became upset. Vieyra 37; Nelson 308. Although she did not yell or scream, Vieyra did raise her voice and told Nelson that she was "starting to get pissed" that Nelson did not believe her. Vieyra 37, 39.

  13. Nelson told Vieyra that things were not working out and that they were "done."  Vieyra 38. Nelson then prepared four write ups. Nelson 309. She provided the write ups to Vieyra, at which point Vieyra realized she had been fired. Vieyra 40-43. Vieyra asked why she was being fired and Nelson responded, "you can no longer perform the duties you were originally hired for," which was a reference to the pregnancy restrictions. Vieyra 41-42.

14. One of the write ups was for allegedly "double dipping" a wax stick which led to a customer complaint. Hearing Exhibit 3. One was for booking appointments too close together, allegedly in contravention of the doctor's note. Hearing Exhibit 6. One was for allegedly taking the appointment book from the salon and being rude and disrespectful when confronted about the appointment book. Hearing Exhibit 5. One was for changing appointments in the appointment book on August 19, 2011. Hearing Exhibit 4.

15. These allegations were without merit and were simply a pretext to terminate Vieyra's employment because of her pregnancy and resulting restrictions. As for the appointment book, Vieyra had not taken the appointment book and there was no valid reason for Nelson or anyone else to suspect she had. Vieyra 46-47.

16. The write up regarding the doctor's note alleged that Vieyra had failed to follow her doctor's restrictions on three dates: August 23, 26, and 29, 2011. Hearing Exhibit 6. On August 23, 2011, Vieyra did perform a pedicure, in violation of her doctor's restrictions. Hearing Exhibit 7 (relevant portions only); Vieyra 51. This pedicure had been booked by the receptionist before she was aware of the doctor's restrictions, and Vieyra chose to perform the pedicure because there was no one else available to do it. Vieyra 52. She wanted to do her part to help out and also wanted to avoid getting into trouble, knowing that she was on Etzel's "shit list." Vieyra 52. Before doing the pedicure she consulted with Nelson, who, although visibly agitated, specifically gave Vieyra permission to perform the pedicure. Vieyra 52. Nelson made a notation on the appointment book indicating that she approved the pedicure. Hearing Exhibit 7; Vieyra 52-53. Aside from the August 23 incident, there was no basis for the allegation that Vieyra failed to follow the doctor's notes; and in fact the allegation was based on an unreasonable interpretation of the medical restrictions. Vieyra 53-57.

17. As for the allegation that Vieyra double dipped a wax stick, Vieyra admitted that she had doubled dipped wax sticks in the past, because Etzel, through the manager at the time, had told Vieyra to do so in order to save wax sticks. Vieyra 58. Employees at Bella Sauvage were pressured to conserve wax sticks. Costello 201. It was very common for employees to double dip wax sticks. Littlefield 181. Christine Scheffer admitted that she had double dipped wax sticks. Scheffer 254-55. After a customer complaint, Nelson had a meeting with the estheticians and told them not to double dip wax sticks any longer. Vieyra agreed that she would no longer double dip wax sticks, and was relieved that she would no longer be required to double dip. Vieyra 59-60; Nelson 326-27. Vieyra explained to Nelson that the reason she had been double dipping was that Etzel had been concerned about the number of wax sticks she was using. Nelson 327. After the meeting with Nelson, Vieyra did not double dip wax sticks, and there

5

was no reason for Nelson to think she had. Vieyra 60; Scheffer 256; Nelson 326.

18. As for the allegation that Vieyra changed an appointment on August 19, 2011, she had not in fact changed an appointment on that date. Vieyra 64. Since Vieyra started at Bella Sauvage, appointments would be based on seniority, so that if a client did not request a particular person, the appointment would go to the most senior employee. Vieyra 65; Littlefield 176. In the past, if the receptionist mistakenly scheduled a client with someone who had less seniority, Vieyra would change the appointment to herself. Vieyra 67. Other employees did the same thing, and Vieyra was never told not to do it. Vieyra 67; Littlefield 176-77. Neither Vieyra nor anyone else had been disciplined for doing so. Vieyra 68-69. In fact, there was no rule prohibiting employees from changing appointments. Littlefield 177. At some point after becoming manager, however, Nelson told Vieyra that the seniority procedure was being changed and asked her not to change appointments any more. Vieyra 67-68. Vieyra agreed that she would not change appointments in the future, and did not change any appointments after her meeting with Nelson. Vieyra 68; Nelson 329-330.

19. The same day she fired Vieyra, Nelson told Etzel what had happened, and Etzel approved the decision. Nelson 330; Etzel 393. Etzel did not attempt to contact Vieyra to discuss the matter. Etzel 393.

20. On October 2 and 3, 2012, a hearing was held before a Hearing Officer of the Department of Labor and Industry on Vieyra's pregnancy discrimination claims against Etzel. Hearing Officer Decision dated 1/25/13 (attached as Exhibit 2). Etzel, who was represented by counsel, testified and presented evidence at the hearing, and had a full and fair opportunity to present her evidence and litigate her case. Etzel's Discovery Responses, Responses to Requests for Admission Nos. 4-6 (Attached as Exhibit 3). The Decision attached hereto as Exhibit 2 is an accurate copy of the Hearing Officer's decision. Etzel's Response to Request for Admission No. 3. (Exhibit 3).

21. On January 25, 2013, the Hearing Officer determined that Vieyra provided direct evidence that she had been fired because of her pregnancy. Decision at 21-23 (Exhibit 2). He found that the "evidence [was] clear that pregnancy related restrictions played the major role in Vieyra's discharge." Decision at 23. He found as a matter of fact that, "the actual cause of [Vieyra's] discharge that day was discriminatory animus of Etzel and Nelson towards her because of Vieyra's pregnancy related limitations." Decision at 11, ¶45. He further noted that "Etzel and Nelson displayed discriminatory animus and took discriminatory actions based upon the pregnancy restrictions." Decision at 23. Etzel approved and upheld the termination. Decision at 16, ¶67. Etzel also actively encouraged Nelson's hostile actions prior to the termination. Decision at

6

24.

22. The Hearing Officer found that Etzel was angry, in fact "outraged" about Vieyra's medical restrictions. Decision at 6, ¶22; 15, ¶63 (Exhibit 2). After learning of the restrictions, Etzel was hostile toward Vieyra. Decision at 8-9, ¶¶31-32. Etzel displayed "active animosity" toward Vieyra. Decision at 24. Even though Etzel had no basis to evaluate Vieyra's medical restrictions, she wrongly assumed that Vieyra was being manipulative and dishonest. Decision at 6-7, ¶23. Etzel kept track of Vieyra's schedule, in order to gather evidence she could use to take adverse action against Vieyra because of her pregnancy. Decision at 9, ¶33. Etzel directed Nelson to force Vieyra to take breaks every half hour even though this was clearly not required by the doctor's note. Decision at 8, ¶29. Etzel was not acting out of concern for Vieyra, but was "taking adverse employment action against her because of her pregnancy and the health restrictions it placed upon her, as [Etzel and Nelson] unreasonably misunderstood them." Decision at 8, ¶ 29.

23. The Hearing Officer awarded Vieyra lost wages, with interest, and emotional distress damages. Decision at 24-25 (Exhibit 2). On July 24, 2013, the Montana Human Rights Commission unanimously affirmed the decision in its entirety. Final Agency Decision (attached as Exhibit 4), see also Defendant's Response to Request for Admission No. 7 (Exhibit 3). Etzel was represented by counsel before the Commission, and had a full and fair opportunity to present her case. Defendant's Responses to Request for Admission Nos. 4 & 6 (Exhibit 3). Both the Department of Labor and Industry and the Human Rights Commission acted in a judicial capacity in adjudicating Vieyra's claims against Etzel, and resolved disputed issues of fact properly before them. Defendant's Responses to Requests for Admission Nos. 8-9 (Exhibit 3).

24. Vieyra filed a petition for enforcement of the agency decision in Missoula County District Court. On August 23, 2013, Etzel filed a counterclaim petition for judicial review pursuant to the Montana Administrative Procedure Act. Response to Petition for Enforcement of Agency Decision and Counterclaim Petition for Judicial Review (Attached without exhibits as Exhibit 5); see also Defendant's Responses to Requests for Admission Nos. 1-2, 10 (Exhibit 3). Etzel's attorney noted that she had filed the petition only "out of an abundance of caution." Motion to Withdraw as Counsel at 2 (attached as Exhibit 6); see also Defendant's Response to Request for Admission No. 12 (Exhibit 3). Etzel's petition for judicial review was never served upon the Montana Human Rights Commission or the Montana Department of Labor and Industry. Defendant's Response to Request for Admission No. 11 (Exhibit 3); petition at 5 (Exhibit 5). 25. Etzel petitioned for bankruptcy in this case while her counterclaim petition for review was pending in district court.

7

Montana Local Bankruptcy Rule 7056-1(2) requires a "separately identified, short, and concise 'Statement of Genuine Issues,' setting forth the specific facts which the opposing party asserts establish a genuine issue of material fact precluding summary judgment." Defendant's brief in response to Plaintiff's Motion includes a section "II. Statement of Genuine Issues" listing Plaintiff's Proof of Claim No. 10 filed in the above-captioned Chapter 11 case in the amount of $157,523.68 based on the Human Rights Commission judgment. Defendant contends that there is a genuine issue as to what portion of Plaintiff's claim is a debt for willful and malicious injury and whether issue preclusion or collateral estoppel applies.

Having reviewed Plaintiff's Statement of Uncontroverted Facts and Defendant's response, the Court deems the above-numbered material facts in Plaintiff's Statement of Uncontroverted Facts admitted pursuant to Mont. LBR 7056-1(a)(2) because they are not controverted in Defendant's Statement of Genuine Issues. There remain the questions raised by Defendant about whether Plaintiff's claim satisfies the requirements of § 526(a)(6) and whether the elements of collateral estoppel are shown.

## DISCUSSION

### I. Summary Judgment.

Summary judgment is governed by FED. R. BANKR. P. 7056. Rule 7056, incorporating FED. R. CIV. P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In*

re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.  *T.W. Elec. Serv.*, 809 F.2d at 631.  In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

Applying this standard, the Court finds and concludes that Plaintiff has satisfied her initial burden to identify those portions of the record which she believes establish an absence of material fact.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d at 630.  Plaintiff listed the above-quoted facts in her Statement of Uncontroverted Facts, and attached hearing transcripts, agency decisions and other pleadings, all of which support her Statement of Uncontroverted Facts.  The burden shifted to the Debtor opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d at 1103-04.  Defendant did not raise genuine issues with respect to any of Plaintiff's enumerated uncontroverted facts.

To demonstrate that a genuine factual issue exists the Debtor was required to produce affidavits which are based on personal knowledge, and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547.  Defendant produced no affidavits based on personal knowledge of the facts of the instant adversary proceeding in support of her opposition. Defendant argues that genuine issues remain as to what portion of Plaintiff's claim is nondischargeable under § 523(a)(6) and whether issue preclusion applies.  Defendant cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. at 247-48, 106 S.Ct. at 2510. What remains appears to be a mixed question of law and fact, and whether the moving party is entitled to judgment as a matter of law under § 523(a)(6). *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

### II. Collateral Estoppel.

Issue preclusion or collateral estoppel refers to "the preclusive effect of a judgment in foreclosing relitigation of issues that have been actually and necessarily decided in earlier litigation." *In re Reynoso*, 477 F.3d 1117, 1122 (9th Cir. 2007), quoting *Frank v. United Airlines, Inc.*, 216 F.3d 845, 850 n.4 (9th Cir. 2000). The doctrine of collateral estoppel or issue preclusion applies in dischargeability proceedings to preclude relitigation of state court findings relevant to exceptions to discharge. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir. 2001); *T & D Moravits & Co. v. Munton (In re Munton)*, 352 B.R. 707, 712 (9th Cir. 2006). The party asserting issue preclusion bears the burden of proof as to all elements, and must introduce a sufficient record to reveal the controlling facts and the exact issues litigated. *Child v. Foxboro Ranch Estates, LLC (In re Child)*, 486 B.R. 168, 172 (9th Cir. BAP 2013).

Under the Full Faith and Credit Act, courts apply the preclusion law of the state in which the judgment originates. *Harmon*, 250 F.3d at 1245; *Munton*, 352 B.R. at 712. The test in Montana to apply collateral estoppel or issue preclusion is stated in *In re Estates of Swanson*, 2008 MT 224, ¶ 16, 344 Mont. 266, 187 P.3d 631:

> (1) the issue decided in the prior adjudication is identical with the one presented in the action in question;
> (2) there was a final judgment on the merits; and
> (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication;

11

*In re Houston*, 2008 WL 5971043 (Bankr. D. Mont. 2008); *see also Safeco Inc. Co. of America v. Liss*, 2000 MT 380, ¶¶ 45, 46, 48, 51, 303 Mont. 519, ¶¶ 45, 46, 48, 51, 16 P.3d 299, ¶¶ 45, 46, 48, 51.  The source of Montana's collateral estoppel test is the California State Supreme Court decision *Teitelbaum Furs, Inc. v. Dominion Ins. Co.* (1962), 58 Cal.2d 601, 25 Cal. Rptr. 559, 560, 375 P.2d 439, 440.  *See, Aetna Life and Cas. Ins. Co. v. Johnson* (1984), 207 Mont. 409, 414, 673 P.2d 1277, 1280.  The party seeking issue preclusion bears the burden of proof on each of the three requirements.  *Harmon*, 250 F.3d at 1245.

Plaintiff argues that her debt from the HRC decision was necessarily determined to be intentional sex discrimination which means Defendant acted willfully and maliciously as defined in § 523(a)(6).  This Court disagrees that the HRC decision contemplated or decided anything under § 523(a)(6), which is a core proceeding in a case where the bankruptcy court, not a state agency, has jurisdiction.

This Court further notes that even if all requirements for collateral estoppel are present, the Court has the discretion "to decline to give issue preclusive effect to prior judgments in deference of countervailing considerations of fairness."  *In re Lopez*, 367 B.R. 99, 108 (9th Cir. 2007).  Before applying collateral estoppel the bankruptcy court also must determine "whether imposition of issue preclusion in the particular setting would be fair and consistent with sound public policy."  *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 824-25 (9th Cir. BAP 2006) (citing *Lucido v. Super. Ct.*, 51 Cal.3d 335, 342-43 (1990)).

The "preferable approach . . . in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine whether it should be applied.  *Lopez,* 367 B.R. at 107-08, quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331

& nn. 14-16 (1979). Under both federal law and California law, upon which Montana law is based, a bankruptcy court retains discretion whether to apply collateral estoppel even where the technical requirements are met, because "issue preclusion is not applied automatically or rigidly, and courts are permitted to decline to give issue preclusive effect to prior judgments in deference of countervailing considerations of fairness." *Lopez*, 367 B.R. at 108.

California courts give preclusive effect to a judgment "only if application of preclusion furthers the public policies underlying the doctrine." *Harmon*, 250 F.3d at 1245. Those policies include the "need to limit litigation against the right of a fair adversary proceeding in which a party may fully present the facts." *Id.* (quoting authority). Since Montana adopted the California test for collateral estoppel in *Aetna Life and Cas. Ins. Co. v. Johnson*, 207 Mont. at 414, 673 P.2d at 1280, this Court considers Montana law to include the discretion given to courts on whether to apply collateral estoppel to further the public policies underlying the doctrine balanced against a party's right to fully present facts in a fair adversary proceeding. *Lopez*, 367 B.R. at 108; *Harmon*, 250 F.3d at 1245.

This Court exercises its discretion against application of collateral estoppel in the instant case. The first two elements of the *Swanson* test are not satisfied. The issue decided in the prior adjudication in HRC decision is not identical with the one presented in this adversary proceeding, and the judgment is not final. Plaintiff's HRC complaint alleged unlawful discriminatory practice because of sex, namely Plaintiff's pregnancy, based upon Montana state statute MCA § 49-2-303. Simply put, issues of sex discrimination in employment are not, in this Court's view, identical to whether a debt is for willful and malicious injury under § 523(a)(6) of the Bankruptcy Code.

Section 523(a)(6) excepts from discharge any debt "(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." *Barboza v. New Form Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,1205 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001).

The Ninth Circuit in *Barboza* reversed a summary judgment excepting a claim for "willful" copyright infringement from discharge under § 523(a)(6). 548 F.3d at 707. Even though the term "willful" is used in copyright infringement cases, the Ninth Circuit stated that it is not equivalent to the term "willful" under § 523(a)(6) because in copyright infringement cases "willful" can be based on intentional or merely reckless behavior, and injuries resulting from recklessness are not sufficient to be considered willful injuries for exception for discharge under § 523(a)(6). *Barboza*, 548 F.3d at 708, citing *Kawaauhau v. Geiger*, 523 U.S. 57, 60-61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

The Ninth Circuit also reversed and remanded the case in *Barboza* because the courts below did not separately analyze the "malicious" prong of § 523(a)(6), and although some overlap may exist between the two prongs the Ninth Circuit requires a separate analysis for both the "willful" and "malicious" prongs. *Barboza*, 545 F.3d at 711; *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *Carrilo v. Su (In re Su)*, 290 F.3d 1140, 1147 (9th Cir. 2002); *Transamerica Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991) (per curiam); *Jercich*, 238 F.3d at 1209.

This Court must analyze the willful and malicious prongs of § 523(a)(6) separately in compliance with *Barboza*, *Sicroff*, *Jercich*, and *Su*. Plaintiff has the burden of proof under § 523(a)(6) to except her claim from Plaintiff's discharge under both prongs. She contends that the

agency finding that Defendant was motivated by discriminatory animus based on Plaintiff's pregnancy satisfies both prongs. There is no analysis in the HRC decision that both prongs of § 523(a)(6) were analyzed separately as required in this Circuit. This Court finds the Plaintiff has failed to satisfy her burden under both the "willful" and "malicious" prongs.

An injury is willful under § 523(a)(6) if the debtor intends the consequences of his actions. *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347 B.R. at 384. The Ninth Circuit wrote in *Su*, 290 F.3d at 1144: "The holding in *In re Jercich* is clear: § 523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain." Subjective belief includes actual knowledge that harm is substantially certain to result. *Su*, 290 F.3d at 1145-46; *Albarran*, 347 B.R. at 384.

Subjective intent may be gleaned from objective factors and circumstantial evidence which tends to establish what the debtor must have actually known when taking the injury-producing action. *Su*, 290 F.3d at 1146 n.6; *Albarran*, 347 B.R. at 384. Reckless disregard is insufficient to establish willfulness under § 523(a)(6). *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Su*, 290 F.3d at 1145-46. The Ninth Circuit wrote in *Su*:

> That the Bankruptcy Code's legislative history makes it clear that Congress did not intend § 523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior, reinforces application of the subjective standard. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su,* 290 F.3d at 1145-46.

Plaintiff has not shown that Defendant's conduct was willful, as opposed to merely recklessness or reckless disregard, which would not be enough to except her debt from discharge

under *Su*. No evidence exists in the record that Defendant intended the consequences to Plaintiff of here actions, either by a subjective intent to harm Plaintiff or a subjective belief that harm to Plaintiff was substantially certain. *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347 B.R. at 384; *Su*, 290 F.3d at 1144.

The "malicious" requirement is satisfied when plaintiff shows "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich*, 238 F.3d at 1209. In the Ninth Circuit conduct must be both willful and malicious for a debt to be excepted under § 523(a)(6), and specific findings must be made that the conduct was willful and malicious. *Barboza*, 545 F.3d at 706, 711.

As the record stands, the Court finds that Plaintiff failed to satisfy her burden by a preponderance of the evidence to prove the "malicious" prong of § 523(a)(6) that Defendant's acts of sex discrimination necessarily caused Plaintiff injury. Since Plaintiff has failed to satisfy her burden under § 523(a)(6) to show Defendant caused her willful and malicious injury by a preponderance of the evidence, the Court denies Plaintiff's Motion for summary judgment.

Plaintiff also argues that Montana's finality requirement for collateral estoppel is relaxed, citing *Baltrusch v. Baltrusch*, 2006 MT 51, ¶18, 331 Mont. 281, ¶18,130 P.3d 1267, ¶18. On the contrary, *Baltrusch* explains why Plaintiff's Motion for summary judgment must be denied. The Montana Supreme Court wrote: "[I]n addition to the [3] above enumerated elements, application of collateral estoppel requires that: (4) the party against whom preclusion is asserted must have been afforded a full and fair opportunity to litigate any issues which may be barred." *Baltrusch*, 2006 MT 51 at ¶18. It is clear that the Defendant was not given a full and fair opportunity in the HRC action to litigate issues under § 523(a)(6) which Plaintiff seeks herein to preclude. The

HRC did not have jurisdiction to hear or decide issues under § 523(a)(6) of the Bankruptcy Code.

Finally, the last enumerated fact quoted above, No. 24, shows that the Defendant filed her bankruptcy petition while her counterclaim for review of the HRC agency decision was pending. Thus, the state court litigation was stayed before the court could hear and decide the HRC decision. It is not a final decision.

In sum, this Court finds that Plaintiff failed to satisfy her burden to show that the issues decided in the HRC agency decision were identical to her § 523(a)(6) claim for relief, and failed to show that the HRC agency decision was final, both of which are required for application of collateral estoppel. This Court further would exercise its discretion against applying collateral estoppel so that Plaintiff's claim for exception from discharge under § 523(a)(6) can be heard and decided in the Bankruptcy Court.

**IT IS ORDERED** a separate Order shall be entered denying Plaintiff's Motion for Summary Judgment.

BY THE COURT

/s/ Ralph B Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana